Filed 6/7/21  P. v. Weatherington CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MONTE LAMARR WEATHERINGTON,<br><br>    Defendant and Appellant. | 2d Crim. No. B303125<br>(Super. Ct. No. F000270432007)<br>(San Luis Obispo County) |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>GREGORY GEORGE VIVED, JR.,<br><br>    Defendant and Appellant. | 2d Crim. No. B303872<br>(Super. Ct. No. F000270432006)<br>(San Luis Obispo County) |

    Monte LaMarr Weatherington and Gregory George Vived, Jr., appeal from orders denying their Penal Code section 1170.95

petitions for resentencing.[1]  In 1998 a jury convicted them of second degree murder (§§ 187, subd. (a), 189) and conspiracy to commit assault by means of force likely to produce great bodily injury.  (§§ 182, subd. (a)(1), 245, former subd. (a)(1), now subd. (a)(4).)  They were sentenced to prison for 15 years to life.  In a 2001 unpublished opinion, *People v. Garcia et al.* (July 23, 2001, B126854) [nonpub. opn.] (*Garcia*), we affirmed the judgment of conviction as to appellants and their codefendants: Oscar Garcia, David Rey, and Sergio Ortiz.

The petitions for resentencing were filed in 2019.  Appellants declared that they fell within the provisions of section 1170.95 because they had been "convicted of second degree murder pursuant to the natural and probable consequences doctrine" and "could not now be convicted of first or second degree murder" because of amendments to the Penal Code.

The trial court determined that appellants had made a prima facie showing of eligibility for relief under section 1170.95.  It issued orders to show cause and conducted a single evidentiary hearing for both appellants.  At the hearing the prosecution was required to prove beyond a reasonable doubt that appellants are ineligible for relief.  The trial court denied the petitions because the prosecution had met its burden.  The court concluded that appellants could now be convicted of second degree murder under a theory of implied malice.

Vived contends that the trial court misinterpreted the prosecution's burden of proof at the hearing.  Both appellants claim that the court applied an erroneous theory of implied malice.  Finally, appellants argue that the evidence is insufficient

---

[1] All statutory references are to the Penal Code.

2

to show that they could now be convicted of second degree murder under a theory of implied malice.

Appellants' appeals have not been consolidated. Because the appeals arise from the same evidentiary hearing and involve similar criminal conduct and common legal issues, in the interest of judicial economy and efficiency we order the appeals consolidated for the purpose of decision. We issue a single opinion affirming the orders denying appellants' petitions. (See *People v. Schnaible* (1985) 165 Cal.App.3d 275, 277 ["Because the same issue is presented in both cases, we order the appeals consolidated and render a single opinion affirming the judgments"].)

*Facts*

For the purpose of setting forth the facts underlying his 1998 conviction, Vived "adopts the Statement of Facts contained in this Court's prior opinion on direct appeal in this matter," i.e., the 2001 unpublished *Garcia* opinion. Weatherington presents a "factual summary . . . taken from this court's prior opinion in *Garcia*." Accordingly, the following summary of the facts is taken from pages 2-5 of the *Garcia* opinion.

Paso Robles 13 (Paso 13) is a criminal street gang. Raul Mosqueda, whose moniker was "dreamer," was a past associate of Paso 13. Mosqueda was friendly with the members of Nameless Crew Style (NCS), a rival gang that was engaged in "warfare" with Paso 13. NCS members "looked to [Mosqueda] kind of as a role model . . . ." He was the best friend of Reginald Arguelles, one of the organizers of NCS. Paso 13 put out a "green light" on Mosqueda, which meant that he was "free game" to kill. David

Rey and Oscar Garcia were members of Paso 13, and Sergio Ortiz associated with the gang.[2]

On April 10, 1998, Manuel Preciado, Rey, Ortiz, Garcia, and appellant Weatherington met at an apartment. Everyone said that they had "a problem" with Mosqueda. They left and drove around in an unsuccessful effort to find him. They were saying, "Let's go find him. We will take care of him and beat his ass."

During the evening of April 12, 1998, Reginald Calhoun went to the trailer park residence of Ortiz and Weatherington. Mosqueda became the subject of conversation, and everyone was saying, "Hey, we want to kick dreamer's ass."

Calhoun was paged by appellant Vived. Calhoun telephoned Vived, who said that Mosqueda was going to be at a party in Paso Robles. Calhoun told Vived to come to the trailer park and communicated Vived's information to the other appellants. When Vived arrived about five minutes later, he was questioned about the party. Calhoun and appellants expressed hatred of Mosqueda and wanted to "kick his ass." Everybody said, "Let's go," and they "started piling into cars[.]" Statements were made that "[t]hey were going to a party . . . to kick dreamer's ass." Preciado joined the group just before they left the trailer park.

_____

[2] We are not aware of any evidence indicating that appellants were affiliated with Paso 13 or knew about the green light. The jury found *not* true allegations that appellants had committed the murder for the benefit of a criminal street gang. (§ 186.22, subd. (b).) At the evidentiary hearing on the section 1170.95 petition, the trial court stated: "I am taking into consideration that the jury did acquit on the gang allegation. I specifically have not referenced portions of the testimony that I reviewed pertaining to the gang expert, Ms. Tobler's testimony."

Calhoun, Preciado, Rey, Garcia, Ortiz, and appellants drove to the Paso Robles party in three cars. Rey was the sole passenger in a car driven by Garcia. Rey was armed with a knife that he displayed to Garcia inside the car. Rey put the knife in his pocket. At the trailer park, Rey had not displayed the knife or mentioned that he possessed it.

After parking their cars in Paso Robles, they walked to the apartment where the party was occurring. Weatherington knocked on the front door. A female opened the door, and Weatherington asked to speak to "dreamer." Mosqueda came to the door and said, "What do you guys want?" Weatherington told him to come outside. Mosqueda said, "We don't want no problems here." Mosqueda closed the door, and another person locked it. Calhoun picked up a potted plant and threw it through a plate-glass window. Rey and Weatherington kicked the front door open. Calhoun, Preciado, Rey, Garcia, Ortiz, and appellants ran through the doorway into the apartment. They were saying, "Get your beating like a man," and "You know what time it is. You know it's up." Everyone inside "just started scattering." Mosqueda retreated into a bathroom and tried to close the door. Calhoun testified that he and Rey pulled Mosqueda out into the hallway, but other witnesses testified that Weatherington did the pulling. Calhoun, Rey, Garcia, Ortiz, and appellants punched Mosqueda in the hallway. There was "a big commotion of bodies" and people were screaming.

Arguelles was at the party with Mosqueda. Arguelles went into the hallway to try to help him. Vived pointed out Arguelles to Weatherington. Weatherington started hitting Arguelles and pushed him into a bedroom, where Weatherington continued the assault.

Mosqueda fell to the floor and was lying on his side against a wall.  Garcia said to Rey, "You got a knife.  You got a knife.  Stick him.  Stick him."  Rey stabbed Mosqueda four times in the chest.  Mosqueda crawled out of the hallway "like a baby" on his hands and knees with blood on his face, chest, and stomach.  Rey, Vived, Garcia, Ortiz, and Calhoun were "around him" and were punching and kicking him.  People in the background were saying, "Leave him alone. He's knocked out."

 Mosqueda fell to his side.  Rey, Vived, Garcia, Ortiz, and Calhoun continued to hit and kick him.  Vived suddenly stopped "swinging and kicking" and "jumped up against the wall."  He said, "Oh shit . . . What happened?  What happened?"  Vived appeared to be "in shock."  Everybody except Ortiz ceased attacking Mosqueda.  Ortiz kicked him twice in the head.  Everybody then left the apartment.

Later that night, Preciado, Ortiz, and Weatherington met Garcia in a parking lot.  Garcia told them that Rey had stabbed Mosqueda "penitentiary style, real quick," and that anyone who said "anything to the cops" would "get bumped off" in prison.  Garcia said that Rey "had got his stripes."  This meant that Rey had earned respect from other gang members and "was up at the top with the big boys . . . ."

When Garcia left, Preciado, Ortiz, and Weatherington went to a motel.  According to Preciado, at the motel they discussed the stabbing, agreeing that Rey "was wrong for doing it . . . without saying anything . . . ."  But earlier in the evening Ortiz had declared, "We got their guy.  It's going to be a good night."

*Senate Bill 1437*

Senate Bill 1437 (2018-2019 Reg. Sess.) (S.B. 1437), which went into effect on January 1, 2019, added section 1170.95 to the Penal Code.  Before the effective date of S.B. 1437, "the natural

and probable consequences doctrine rendered a defendant liable for murder if he or she aided and abetted the commission of a criminal act (a target offense), and a principal in the target offense committed murder (a nontarget offense) that, even if unintended, was a natural and probable consequence of the target offense.  [Citation.]"  (*People v. Lamoureux* (2019) 42 Cal.App.5th 241, 247-248; see also *People v. Chiu* (2014) 59 Cal.4th 155, 158 ["'under the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also "for any other offense that was a 'natural and probable consequence' of the crime aided and abetted"'"].)

S.B. 1437 amended section 188 to add subdivision (a)(3), which provides, "Except as stated in subdivision (e) of Section 189 [the felony-murder rule], in order to be convicted of murder, a principal in a crime shall act with malice aforethought.  Malice shall not be imputed to a person based solely on his or her participation in a crime."  (Stats. 2018, ch. 1015, § 2.)  The Legislature declared, "A person's culpability for murder must be premised upon that person's own actions and subjective mens rea."  (*Id.*, § 1, subd. (g).)  "[T]he most natural reading of Senate Bill 1437's operative language is that it eliminates natural and probable consequences liability for first and second degree murder."  (*People v. Gentile* (2020) 10 Cal.5th 830, 849 (*Gentile*).)

Section 1170.95 gives retroactive effect to the changes made by S.B. 1437's amendment of section 188.  It provides, "A person convicted of . . . murder under a natural and probable consequences theory may file a petition with the court that sentenced the petitioner to have the petitioner's murder conviction vacated and to be resentenced on any remaining counts when" certain conditions apply.  (§ 1170.95, subd. (a).)

7

One of the conditions is that "[t]he petitioner could not be convicted of first or second degree murder because of changes to Section 188 [made by S.B. 1437] . . . effective January 1, 2019." (*Id.*, subd. (a)(3).)

"The court shall review the petition and determine if the petitioner has made a prima facie showing that the petitioner falls within the provisions of [section 1170.95]. . . . If the petitioner makes a prima facie showing that he or she is entitled to relief, the court shall issue an order to show cause." (§ 1170.95, subd. (c).) "Within 60 days after the order to show cause has issued, the court shall hold a hearing to determine whether to vacate the murder conviction and to recall the sentence and resentence the petitioner . . . ." (*Id.*, subd. (d)(1).) "At the hearing . . . , the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing. . . . The prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens." (*Id.*, subd. (d)(3).)

*Trial Court's Ruling at the Hearing*
*Conducted after Issuance of Order to Show Cause*

At the hearing conducted after the issuance of an order to show cause, the trial court noted that the prosecution had provided it with our unpublished *Garcia* opinion and "thousands of pages" of the 1998 trial transcript. The court said it was making its determination based on the "entire record," including the trial transcript. The court continued, "I do believe, based on the state of evidence in this case, that the People have proven malice beyond a reasonable doubt under the elements of implied malice, so I'm going to deny the petition as to both [appellants]."

8

*Alleged Misinterpretation by Trial Court of*
*Prosecution's Burden of Proof*

Vived correctly asserts, "[T]he record in this case shows the superior court applied an independent factfinder standard based upon proof beyond a reasonable doubt . . . ."[3]  Vived argues that,

_____

[3] The appellate courts are divided as to the appropriate standard of proof at a hearing conducted after the issuance of an order to show cause.  In *People v. Duke* (2020) 55 Cal.App.5th 113, 123, rev. granted Jan. 13, 2021, S265309, the court concluded, "To carry its burden, the prosecution must . . . prove beyond a reasonable doubt that the defendant *could* still have been convicted of murder under the new law—in other words, that a reasonable jury could find the defendant guilty of murder with the requisite mental state for that degree of murder.  This is essentially identical to the standard of substantial evidence . . . ."  On the other hand, in *People v. Lopez* (2020) 56 Cal.App.5th 936, 949 (Lopez), rev. granted Feb. 10, 2021, S265974, the court stated, "[W]e construe the statute as requiring the prosecutor to prove beyond a reasonable doubt each element of first or second degree murder under current law . . . ."  In granting review in *Duke*, our Supreme Court said: "The issue to be briefed and argued is limited to the following: Can the People meet their burden of establishing a petitioner's ineligibility for resentencing under Penal Code section 1170.95, subdivision (d)(3) by presenting substantial evidence of the petitioner's liability for murder under Penal Code sections 188 and 189 as amended by Senate Bill No. 1437 (Stats. 2018, ch. 1015), or must the People prove every element of liability for murder under the amended statutes beyond a reasonable doubt?" (*People v. Duke* (Jan. 13, 2021, No. S265309) ___Cal.5th___ [2021 Cal. LEXIS 242, at *1].)  We need not attempt to resolve this issue here.  The trial court acted as an independent fact finder and applied the more stringent "beyond a reasonable doubt" standard of proof.  As we discuss below, substantial evidence supports the trial court's finding that the prosecution proved the elements of implied-

9

instead of applying this standard, the court should have required the prosecution to prove beyond a reasonable doubt that the jury found him guilty of second degree murder on a still valid legal theory and did not find him guilty on the now invalid natural and probable consequences theory.

Vived's argument is untenable for three reasons. First, it "is inconsistent with section 1170.95, subdivisions (a)(3)'s and (d)(3)'s explicit direction to the court to determine if the petitioner could now be convicted of murder under section[] 188 . . . as amended, not whether he or she was, in fact, convicted of murder under a still-valid theory. Second, subdivision (d)(3) permits both parties to present new or additional evidence at the hearing after issuance of the order to show cause. If the superior court's ineligibility ruling may be based on evidence not heard by the original trier of fact, the Legislature cannot have intended the court simply to evaluate the grounds on which the original verdict was reached. Finally, section 1170.95 is available to defendants convicted of murder following a plea in lieu of a trial. Given the limited record in many of those cases, it would be impossible to assess whether a still-valid ground for a murder conviction existed, let alone to determine beyond a reasonable doubt that the valid ground was the basis for the plea. Yet section 1170.95 contemplates the same procedure to determine ineligibility in plea cases as in cases in which the murder conviction was reached at trial." (*People v. Rodriguez* (2020) 58 Cal.App.5th 227, 239-240, rev. granted March 10, 2021, S266652.)

---

malice murder beyond a reasonable doubt.

Vived contends that the court "erred by denying [his] petition based only upon a finding that appellant directly aided and abetted an assault with implied malice." Vived maintains that, to be presently liable for second degree murder, he must have directly aided and abetted the crime of murder. "[A] direct aiding and abetting theory . . . requires that 'the aider and abettor . . . know and share the murderous intent of the actual perpetrator.'" (*Gentile*, *supra*, 10 Cal.5th at p. 850.) Vived explains: "A conviction for second degree murder based upon . . . directly aiding and abetting a second degree murder with implied malice is very clearly authorized under the revised law . . . ." "Aiding and abetting a target offense such as aggravated assault, or any other non-murder target offense, with implied malice is insufficient." "Here, the direct cause of the victim's death was the stabbing, and the superior court did not find appellant aided and abetted in that act."

Weatherington makes a similar argument: "[Under S.B. 1437] a defendant can only be convicted of murder on an aiding and abetting theory as a direct aider and abettor in the murder, not in some other crime. Aiding and abetting a target offense such as aggravated assault, or any other non-murder target offense, with implied malice is insufficient." "Because it appears that the trial court erroneously denied [Weatherington's] petition based on a finding that he aided and abetted the target crime of felony assault with implied malice, the trial court's order should be reversed . . . ."

The trial court did not misconstrue the current law of implied-malice murder. The law does not require appellants to have directly aided and abetted the crime of murder, i.e., Rey's

stabbing of Mosqueda. "'Malice is implied when the killing is proximately caused by "'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.'" [Citation.] In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another . . . .'" (*People v. Cravens* (2012) 53 Cal.4th 500, 507.) "Implied malice does not require an intent to kill." (*People v. Gonzalez* (2012) 54 Cal.4th 643, 653.) S.B. 1437 did not repeal the law imposing criminal liability for implied-malice murder. (*Gentile, supra*, 10 Cal.5th at p. 850 ["notwithstanding Senate Bill 1437's elimination of natural and probable consequences liability for second degree murder, an aider and abettor who does not expressly intend to aid a killing [i.e., he is not a direct aider and abettor of the killing] can still be convicted of second degree murder if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life"].)

At oral argument, counsel for Vived contended that his client's position is supported by *People v. Powell* (2021) 63 Cal.App.5th 689 (*Powell*). Since *Powell* was decided too recently to be briefed by the parties, we permitted them to submit supplemental letter briefs on the opinion. In his letter brief Vived asserts: "Pursuant to . . . *Powell*, the relevant question was not whether appellant intended to aid and abet in a violent/felony assault, i.e., the group beating, upon the victim while acting with implied malice. Rather, to sustain appellant's conviction on a direct aiding and abetting implied malice theory, the prosecution was required to prove appellant 'kn[ew] and share[d] the murderous intent of the actual perpetrator' [citation], i.e., in this case it was required to [prove] appellant intended to aid and abet

12

in the act that caused the victim's death, the stabbing, with knowledge the perpetrator intended to commit that act, with the intent to facilitate that act, while acting with implied malice [citation]."

Vived has misconstrued *Powell*. There, defendant Langlois was convicted of second degree murder based on his participation in a four-on-one beating of the victim after an invasion of the victim's home. During the beating, codefendant Powell fatally stabbed the victim. Langlois claimed that the court's instructions "allowed the jury to find him guilty of murder on a legally invalid theory" – direct aiding and abetting of an implied malice murder. (*Powell, supra*, 63 Cal.App.5th at pp. 709-710.) The court "reject[ed] Langlois's contention that direct aiding and abetting implied malice murder is an invalid legal theory." (*Id*. at p. 714.) But it concluded that the aiding and abetting "instructions were erroneous" because they "were not tailored for implied malice murder." (*Ibid*.) The court explained: "[The aiding and abetting] instruction couches direct aiding and abetting liability in terms of the aider and abettor knowing the perpetrator intended to commit *the crime*, the aider and abettor intending to aid and abet the perpetrator in committing *the crime*, and that, by words or conduct, the aider and abettor in fact aided the perpetrator's commission of *the crime*. As relevant here, 'the crime' would be murder. But . . . the aider and abettor of implied malice murder need not intend the commission of *the crime* of murder. Rather, relative to the aider and abettor's intent, he or she need only intend the commission of the perpetrator's *act*, the natural and probable consequences of which are dangerous to human life, intentionally aid in the commission of that *act* and do so with conscious disregard for human life." (*Ibid*.)

13

Here, appellants intentionally aided and abetted the commission of life-endangering acts: a home invasion by seven persons determined to kick the victim's "ass" and the subsequent group beating of the defenseless victim. Pursuant to *Powell*, no additional intent is necessary for implied-malice murder. (See *Powell*, *supra*, 63 Cal.App.5th at p. 713 ["to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act"].)

*Sufficiency of the Evidence*

Our Supreme Court has "'interpreted implied malice as having "both a physical and a mental component. The physical component is satisfied by the performance of 'an act, the natural consequences of which are dangerous to life.' [Citation.] The mental component is the requirement that the defendant 'knows that his conduct endangers the life of another and . . . acts with conscious disregard for life.' . . .'"" (*People v. Soto* (2018) 4 Cal.5th 968, 974.) Appellants maintain that the evidence is insufficient to prove the mental component of implied-malice murder. We review for substantial evidence the trial court's finding that the prosecution proved the mental component beyond a reasonable doubt. (*Lopez*, *supra*, 56 Cal.App.5th at p. 953.) "'[U]nder the substantial evidence standard, the question is whether any rational trier of fact could find the legal elements satisfied beyond a reasonable doubt . . . .'" (*People v. Lindberg* (2008) 45 Cal.4th 1, 36.) "'[W]e review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the [trier of fact] could reasonably have deduced from the evidence. [Citation.] "Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the

14

exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  [Citation.]  We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.  [Citation.]"  [Citation.]  A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support'" the [judgment].'" (*People v. Penunuri* (2018) 5 Cal.5th 126, 142.)

Vived

Vived claims that the evidence is insufficient to establish the mental component of implied-malice murder because he was not a member or associate of Paso 13, he did not know Rey had a knife, and he expressed shock and dismay when he realized that Mosqueda had been stabbed.  We conclude that substantial evidence supports the elements of the mental component.

Vived was present at the trailer park when the group said they "wanted to kick dreamer's ass."  Calhoun testified that there was "hatred from the group towards dreamer; hatred from me towards dreamer . . . .  [E]verybody felt the same way."  At a party approximately two months earlier, Vived had argued with Mosqueda and had threatened to kill Mosqueda's girlfriend and her baby.

On the night of the murder, Vived led the group to the apartment where Mosqueda was attending a party.  Preciado testified:  "[Vived's] words were, 'We found dreamer.  He's up here.  Let's go.'  And [Vived] started pointing his finger towards the apartment."  When the door to the apartment was kicked open, Vived and the other six members of the group "rushed" into the house.  Calhoun testified that, when seven persons "invade a house" to "kick somebody's ass," the victim could be hurt badly

15

enough to suffer "broken bones" or "die." It is reasonable to infer that Vived realized that Mosqueda's life would be endangered as a result of the violent home invasion by seven persons who hated Mosqueda and were determined to "kick his ass."

Vived participated in the brutal attack upon Mosqueda. Calhoun saw Vived, Weatherington, Rey, and Garcia hit Mosqueda in the hallway. Calhoun testified, "I just seen fists flying." Rodney Reece, a guest at the party, saw Vived and his accomplices, except Weatherington, kicking Mosqueda in the hallway. Preciado testified: Mosqueda was on his hands and knees, "crawling out of the hallway." Blood was on his face, stomach area, and chest. He was surrounded by Vived, Rey, Garcia, Calhoun, and Ortiz. "They were punching him. They were kicking him. I heard people in the background say 'leave him alone. He's knocked out. Someone's going to call the cops' . . . ." Mosqueda fell to the ground onto his side. Vived "stopped swinging and kicking. He jumped up against the wall." "He was like, 'Oh, shit,' you know? 'What happened? What happened?'" "And then everybody [except Ortiz] stopped kicking and hitting him." Ortiz kicked Mosqueda twice in the head. Vived testified: "[I]t looked like [Rey] went down, swinging on [Mosqueda], and then it caught my eye when [Rey] sort of got up from hitting him and going down low, I noticed blood on [Mosqueda's] chest area squirting out."

Vived was not affiliated with Paso 13, did not know Rey had a knife, and displayed shock and dismay when he realized that Mosqueda had been mortally wounded. But these factors do not negate the presence of substantial evidence of the mental component of implied malice. A rational trier of fact could find beyond a reasonable doubt that Vived participated in a home invasion and seven-against-one brutal beating of a defenseless,

16

despised victim knowing that his conduct endangered the victim's life and acting with conscious disregard for life.  It is of no consequence that Vived did not intend to kill Mosqueda.  "Murder does not require the intent to kill.  Implied malice—a conscious disregard for life—suffices."  (*People v. Bland* (2002) 28 Cal.4th 313, 327.)

Weatherington

Weatherington asserts that he "was the least culpable person who participated in the assault."  He was not affiliated with a gang and did not know Rey was armed.  He "did not encourage the stabbing and was the only defendant not close to . . . Mosqueda when he was stabbed.  [He] was not present when other defendants continued to hit or taunt Mosqueda after he was stabbed."  Weatherington continues, "While agreeing to participate in [an] unarmed 'beat-down' may show [he] understood there was a likelihood that Mosqueda would be seriously injured, that does not amount to substantial evidence that he knew 'that his conduct endangers the life of another.'"

But Weatherington is in the same position as Vived.  Like Vived, he participated in a violent home invasion knowing that the seven home invaders intended to commit a vicious assault against Mosqueda.  The jury found Weatherington guilty of conspiracy to commit an assault by means of force likely to produce great bodily injury.  (§§ 182, subd. (a)(1), 245, former subd. (a)(1), now subd. (a)(4).)  "[T]he crime of conspiracy requires dual specific intents: a specific intent to agree to commit the target offense, and a specific intent to commit that offense."  (*People v. Jurado* (2006) 38 Cal.4th 72, 123.)

Weatherington played a vital role in the conspiracy.  He and Rey kicked open the front door of the residence.  Mosqueda, Rodney Reece, and another person sought shelter inside a

17

bathroom. Reece testified that they tried to close the bathroom door but were unable to do so because Weatherington "pushed it open." Weatherington "grabbed" Mosqueda and "[t]hrew [him] to the middle of the hallway." Weatherington then yelled, "'Who's Reggie? Who's Reggie?'" He was referring to Reginald Arguelles, Mosqueda's best friend. Vived "pointed [Arguelles] out" for Weatherington. Weatherington "grabbed [Arguelles] and threw him into the bedroom." Weatherington fought with Arguelles, who testified: "I just stood there and dropped. I just covered up, and I just took the hits." Arguelles "heard someone yell out, 'The police are coming.'" Arguelles "got up" and saw Weatherington "just leaving."

Thus, Weatherington's absence when his accomplices were attacking Mosqueda was not due to his withdrawal from the conspiracy. He was absent because, pursuant to the conspiracy, he was attacking Mosqueda's best friend, Arguelles, to prevent him from coming to Mosqueda's defense. Consequently, Mosqueda was left alone and helpless against the ruthless beating inflicted by Vived, Rey, Garcia, Ortiz, and Calhoun. In these circumstances, a rational trier of fact could find beyond a reasonable doubt that Weatherington knew his conduct endangered Mosqueda's life and that he acted with conscious disregard for life.

*Conclusion*

We agree with the trial court's summation of its reasoning: "I don't think that it's beyond the scope of human understanding on the part of [appellants] . . . that when seven [persons] go to a house with hatred towards an individual, those [persons] break down the door and gallop or rush in and proceed to assault the individual, kicking and hitting and knocking him down when he's unarmed with nobody to come to his assistance, . . . that that sort

18

of a violent beat-down could have easily resulted in what occurred in this case, that that act was dangerous to human life, and that [appellants] acted with conscious disregard for human life . . . ."

*Disposition*

The orders denying appellants' petitions for relief under section 1170.95 are affirmed.

NOT TO BE PUBLISHED.

YEGAN, J.

We concur:

GILBERT, P. J.

PERREN, J.

Jacquelyn H. Duffy, Judge

Superior Court County of San Luis Obispo

_____

Law Offices of Allen G. Weinberg and Allen G. Weinberg, under appointment by the Court of Appeal for Defendant and Appellant, Weatherington.

Eric R. Larson, under appointment by the Court of Appeal for Defendant and Appellant, Vived.

Xavier Becerra, Rob Bonta, Attorneys General, Matthew Rodriquez, Acting Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill, Charles S. Lee, Supervising Deputy Attorneys General, Heidi Salerno, Deputy Attorney General, for Plaintiff and Respondent.